## EXPERT REPORT OF CAREN B. GOLDBERG, PH.D.,

### December 15, 2010

I have been asked by the Law Office of Rohn & Carpenter, to provide expert testimony in the matter of Benjamin Prentice and Sophia Francis v. OfficeMax North America, Inc. and OfficeMax, Inc.. The matter concerns whether the Defendant discriminated against the plaintiffs in their employment practices on the basis of race, color and national origin.

### SUMMARY OF QUALIFICATIONS AND EXPERIENCE

I have been a faculty member in the Management Department at the Kogod School of Business at American University for five years. Prior to joining American University, I was on the faculty at George Washington University for nine years, two of which I served as the Program Director for Human Resources. For over a decade, I have taught undergraduate, masters and doctoral level courses in Human Resource Management, Organizational Behavior, and Research Design. Discrimination is a topic which I have covered in my undergraduate and masters level Introduction to Human Resource courses, my undergraduate Cases and Exercises in Human Resource Management courses, my masters level Human Resources/Organizational Behavior survey courses, my masters level Performance Management and Development courses, and my Ph.D. Seminar in Human Resource Management. In addition, I have covered the topic of discrimination in several off-campus Accelerated MBA and Executive MBA courses that I've taught, as well as in training modules that I have designed and delivered for the Center for Excellence in Public Leadership and the Council of Governments.



DEFENDANT'S EXHIBIT

I have written more than 50 articles for peer-reviewed journals and conferences, more than 40 of which have specifically addressed issues relating to diversity and/or harassment. I have also authored four invited book chapters on diversity/discrimination. My research has been published in *Journal of Applied Psychology, Human Relations, Human Resource Management, Group and Organization Management, Journal of Organizational Behavior, Psychology of Women Quarterly, Academy of Management Best Paper Proceedings, Sex Roles, Assessment, Journal of Business Research, Representative Research in Social Psychology, Journal of Career Planning and Development, Business Journal of Hispanic Research,* and *Journal of Managerial Psychology.* I have also conducted several media interviews, including a *Dateline, NBC* story on discrimination and a local affiliate news piece on sexual harassment.

I have engaged in a variety of important leadership roles in my profession, including a three-year term as an Associate Editor of *Group and Organization Management*, an editorial board member of *Group and Organization Management, Human Resource Management*, and *Journal of Management*, and Track Chair for the Human Resource Division of the Southern Management Association. I was recently appointed to a taskforce created by the Society for Human Resource Management (SHRM) and the American National Standards Institute (ANSI), charged with developing national standards in the area of Diversity and Inclusion.

I received my B.A. degree in Psychology from the State University of New York at Stony Brook in 1987, my M.B.A. degree from the State University of New York at Binghamton in 1990, and my Ph.D. degree in Management from Georgia State University in 1997.

From 1988 to 1989, I worked in the compensation department at United Health

BP000195

Services.

In February, 2008 I provided expert testimony in Sullivan v. Brodsky, Kayne, and Morgan Stanley, United States District Court, Southern District of New York Index No. 07-CV-00003 (BSJ) (KNF).  In March, 2009, I provided expert testimony in Apsley, et al. v. The Boeing Company, The Onex Corporation, and Spirit Aerosystems, United States District Court, District of Kansas Case No.: 05-1368-MLB-KMH.  I have also provided written expert reports for over a dozen matters.

Included with this report is a current copy of my *curriculum vitae*, which contains a more detailed description of my professional background, including a list of my publications.

## MATERIALS CONSIDERED

In preparing this report, I considered the following materials:

-Complaint
-Answer to Plaintiffs' Complaint
-Deposition of Sophia Francis
-Deposition of Benjamin Stephen Prentice
-Deposition of Juliette Bynum
-Deposition of Rafael Flores
-Deposition of Nannette Ramirez Delfaus
-Deposition of Mary Elizabeth Bryan
-Deposition of Christopher Scott Richardson
-Deposition of Rebecca Rees
-Affidavit of Sophia Francis
-Affidavit of Benjamin Prentice
-Notice of Production (Sophia Francis)dated 8/31/10
-Defendant OfficeMax North America, Inc. Supplemental answers to
Plaintiff Benjamin Prentice's first set of Interrogatories
-Defendant OfficeMax North America, Inc. Supplemental answers to
Plaintiff Sophia Francis' first set of Interrogatories
-Defendant's OfficeMax North America, Inc. Supplemental responses to
Plaintiffs' Demand for Production
-Defendant OfficeMax North America, Inc. answers to Plaintiff Sophia
Francis' first set of Interrogatories

BP000196

-Notice of Production (Benjamin Prentice) dated 4/7/10
-Sophia Francis Supplemental response to OfficeMax North America, Inc.
Interrogatories
-Benjamin Prentice Supplemental response to OfficeMax North America,
Inc. Interrogatories
-OfficeMax North America, Inc. Supplemental Initial Disclosures
-Notice of Production (Benjamin Prentice) dated 1/26/10
-Benjamin Prentice response to OfficeMax North America, Inc.
Interrogatories
-Sophia Francis response to OfficeMax Inc. Interrogatories
-OfficeMax North America, Inc.'s Amended Initial Disclosures
-OfficeMax North America, Inc.'s Initial Disclosures
-Benjamin Prentice Voluntary Disclosure
-Plaintiffs' Discrimination Complaint Form
-OfficeMax Inc. Verified responses to Plaintiffs' Charge of
Discrimination
-Plaintiffs' Charge of Discrimination
-Documents brought in by Benjamin Prentice
-Plaintiffs' response to OfficeMax Initial Disclosures
-Demand letter from Atty. Rohn to Atty. Morgan dated 11/10/10
-OfficeMax Inc. Responses to Plaintiffs' Second Demand for Production dated 11/17/10
- OfficeMax Inc. Notice of Production of Documents dated 11/22/10

In addition, I have referred to scholarly articles, which are cited in my report.

**COMPENSATION**

For my time working on this matter, I am paid $350.00 per hour.

**EXPERT OPINION**

During their employment at OfficeMax, both Mr. Prentice and Ms. Francis, both Black West

Indian Supervisors, were subjected to a number of unfair human resource practices. The crux of the

matter is that to the extent that there were any checks and balances on actions against employees, they

were sorely lacking. Examples abound:

- Hourly employees were evaluated on and received corrective actions for store-wide issues that were beyond their control
- Assistant Managers were able to issue corrective actions without Store Manager approval;
- Unsigned and undated corrective actions were permitted to be placed in employee personnel files
- Largely blank (and unsigned by anyone) performance appraisals were allowed to be placed in employee personnel files
- When errors were noted in performance appraisals, they were not corrected
- When pay inequities were identified and brought to upper management's attention, they were never rectified
- When progressive discipline wasn't followed, there were no repercussions
- When eligible employees applied for new positions, they were not considered
- Prior to the reorganization, job descriptions bore little resemblance to the work being performed
- Meetings whereby Store Managers were apprised of any developments were either conducted in Spanish or excluded English-speaking Store Managers, altogether
- As part of the reorganization, "new" positions were created that were nearly identical to the jobs that were being eliminated

The degree to which these actions may be deemed discriminatory rests largely on whether there were legitimate business reasons for these decisions. Therefore, in the following sections, I outline these practices and discuss why these decisions cannot reasonably be attributed to legitimate business reasons.

BP000198

**Corrective Actions**

Because Associates' eligibility to be rehired was contingent on not having a final warning, OfficeMax's practices with regard to corrective actions have consequences that extend far beyond being unfairly written-up at a given point in time.  My opinion with regard to corrective actions as they relate to the current matter has four components.  First, hourly employees should not be issued corrective actions for problems that are beyond their control (c.f., Gomez-Mejia, Balkin, & Cardy, 2010[1]). Consequently, it is inappropriate to weight store-wide performance into assessments of and disciplinary actions against hourly employees'.  Second, as indicated in the Society for Human Resource Management's  (SHRM's) Performance Management Learning Module, one of the goals of performance management is to enhance communication between employees and managers.  OfficeMax's failure to make Mr. Prentice aware of disciplinary actions that had been placed in his file runs counter to this objective.  Third, that discipline should be implemented progressively (with exceptions for very serious violations), is cited as the approach one should follow (c.f., Gomez-Mejia, Balkin, & Cardy, 2010[2]). Fourth, as Latham and Wexley (p. 236; 1994) note, "it is imperative that you attempt to collect all the facts before you take disciplinary action."  Therefore, it is clear that an absence that had been previously approved by one's manager does not constitute a reasonable basis for corrective action.

<u>Mr. Prentice's file contained a corrective action of which he was unaware</u>

As part of OfficeMax's policy, stores are periodically reviewed by Loss Prevention Auditors.  As a result of one such audit done in February, 2008, a verbal warning was placed in Mr. Prentice's file, that Mr. Prentice testified (154) he never received.  This document (Ex. 10) has no creation date and no

[1] Although I used this text as an example, one would be hard-pressed to find an HR text that would recommend otherwise.
[2] Although I used this text as an example, one would be hard-pressed to find an HR text that would recommend otherwise.

signatures, but references an audit done on 2/6/08 (though it was typed as 11/6/08 and penciled over, to say "February").  Indeed Mr. Prentice further testified that until the meeting he had regarding this audit, he did not believe he played a role in the matrix or LP edge activities, the action areas addressed on the unsigned written warning:  "I didn't even know what the matrix was until she and Juliette explained it to me…. I thought matrix came under logistics… Logistics is the one who used to put the stuff… on the floor.  It was after the failure, they call me and tell me during the discussion or whatever they fail this, and they need me to start doing this."  In addition to Mr. Prentice being unaware that this corrective action was placed in his file, neither Mr. Flores nor Ms. Bryan was able to explain how an unsigned warning could appear in an employee's file.   Exhibit 5, a memo from Juliette to Nannette dated 2/14/08, indicated that Mr. Prentice objected to being held accountable for the matrix, since it wasn't in his job description and that he refused to sign a coaching document, and that he does not know what his responsibilities are.  From my own review of Exhibit 4, the Sales Supervisor job description, I saw no mention of the matrix.  Moreover, Ms. Bynum's sworn testimony revealed that she recalled having a discussion with Mr. Prentice about the fact that he wasn't told he'd be 100% accountable for the matrix and that if it were simply a matter of Mr. Prentice refusing to sign (76), "I would have signed it, and I would have had a witness sign it, and just wrote in his signature, 'refused to sign'."

<u>Both Mr. Prentice and Ms. Francis were disciplined for store-wide problems that were out of their control</u>

        As a result of this same audit, Ms. Francis also received a verbal warning (Ex 10).  Referring to this warning, which she declined to sign (83), Ms. Francis testified, "That's when the store had evaluation, and everybody failed.  I'm management when it's fail time, but when it pay time, raise time, I'm not part of management."  Ms. Francis' testimony reflects that she did not believe that this

corrective action was appropriately addressed to her. Mr. Flores concurred. In his deposition, when asked if he ever made any findings that any of the supervisors were not performing to standard, he testified (26), "No. And that's not the way I operate, either. The store manager is responsible for it. And they're responsible, also, for the leadership for the building. So if there's something wrong with any of the supervisors, she's the one who has to handle it." Likewise, Ms. Bynum testified (107), "with the stockroom in the condition that it was in, it was impossible, literally for her to do that job." Clearly, then, there was no legitimate business reason for penalizing hourly employees for the results of these audits.

Despite the agreement that Mr. Prentice and Ms. Francis, who were hourly employees, should not be held accountable for issues relating to loss prevention, both Ms. Francis and Mr. Prentice (albeit, unbeknownst to him) had corrective actions placed in their file, as a result of the February 2008 audit.

## OfficeMax did not adhere to a policy of progressive discipline

As noted above, verbal warnings were placed in the files of Mr. Prentice and Ms. Francis. While Ms. Francis was aware of the corrective action, she refused to sign the corrective action form. In Mr. Prentice's case, he couldn't object, because he was never made aware that a corrective action had been issued. After these actions were taken, both were escalated to final written warning, even though both of the verbal warnings indicated that the next level in the corrective action process would be a written warning. In the case of Mr. Prentice, no evidence has been proffered that there was ever a policy violation or what that violation may have been. Nonetheless, the spreadsheet on Bates 765 indicates that he was on final warning for an unspecified policy violation. Certainly, if a policy violation were so egregious as to warrant a final warning, one would expect it to be documented somewhere and to be known amongst relevant individuals. However, of the deponents who were asked if they had any

knowledge of any such corrective action (Ramirez, Flores, Prentice, Bryan, and Richardson) none was aware.

In the case of Ms. Francis, after the verbal warning that resulted from the store's failure during the loss prevention audit, the next corrective action was a final written warning. Ms. Bynum (101) testified that she did not know how the discipline advanced to a final written warning. With regard to OfficeMax's disciplinary policy, Ms. Bynum further indicated that, "There could be an escalation from a verbal warning to a final warning, depending on the level of the violation or, you know, the offense. But, no, I don't know why." While many organizations make allowances for "jumping" steps in a progressive discipline plan, typically, this process is reserved for violations that are very serious and/or repeated. For example, Latham and Wexley (1994, p. 232) note, "someone who shoots the boss is unlikely to be given only a verbal warning. The rationale underlying progressive discipline is that the issue is correctable." In the present case, Ms. Francis' final written warning resulted from an absence that she had already cleared with her manager. This practice runs counter to the practice of collecting all the facts before taking disciplinary action, as noted in Latham and Wexley's (1994) text. Further, SHRM's Performance Management Learning Module indicates that "A manager should never review an employee if that employee's work is not known to the manager. In the case of Ms. Francis' disciplinary action, Ms. Ramirez indicated that she approved the final written warning, without having ever discussed the absence with Ms. Bynum and without having ever met Ms. McMichael.

BP000202

<u>Ms. Francis' final warning resulted from an absence that had already been approved by the</u>

<u>Store Manager</u>

Ms. Francis' testimony (76) indicates that when her son was hospitalized for a period of time, "I called, and I told the store manager, Juliette Bynum, my situation. And she told me to take care of my son… I spoke to the manager. She said take care of my son, she prayed for me." Yet, despite reassurances from Ms. Bynum, Ms. Francis received a final written warning from the Assistant Store Manager, Ms. McMichael, who e-mailed Ms. Ramirez (Ex 13) on 3/21/08 wanting to know whether the absence should warrant a termination or a final written. Ms. Ramirez testified that "I spoke with Marty McMichael personally on that same date…She wanted to terminate or fire Sophia for job abandonment because since March 14[th] and through the date of this e-mail, they had not received any type of communication from Sophia. She had been out or had not showed up to work." Ms. Bynum testified that although she was consulted regarding corrective actions for Ms. Francis' absence in March 2008, she did not agree with it: "I had a conversation with Ms. Francis when her son was in the hospital, and I told her not to worry, to take care of her son. And I later had a conversation with Ms. McMichael that during the time she was out, she didn't call in every day. And I mentioned that the fact that I said, 'Don't worry, take care of your son,' could have been construed as just you don't have to call in every day… I just know I was not in agreement that she should be penalized, because it could have been my fault that she didn't call in."

The policy on attendance (Bates 277 of Ex 10) indicates that, "Associates are required to provide adequate advanced notice if they will be absent from or arrive late to work…. Associates will be subject to corrective actions if unscheduled work absences or tardiness become excessive and negatively impact work quality and OfficeMax's internal and external

customers." Although Ms. Francis indicated (77) that she subsequently called Ms. Ramirez, who told her that she should have called ever day, nothing in this policy indicates that a single absence episode necessitates a daily alert. Indeed, such a policy would border on absurd, when one imagines an employee who, for example, may be recovering from surgery for a month and is required to call on a daily basis to remind his/her employer that s/he is *still* recovering.

In short, the corrective actions issued to Mr. Prentice and Ms. Francis were based on poor HR practice: both employees were disciplined for things beyond their control; Mr. Prentice was unaware of the verbal warning placed in his file; the disciplinary actions were not progressive; and, in the case of Ms. Francis, the action was issued as a result of something she had previously cleared with her Store Manager. Given that Mr. Richardson testified (42), "We began looking at our field structure related to all of our store level positions in late 2007," and that the Defendant was unable to articulate a reasonable explanation for the final written warnings issued to Mr. Prentice and Ms. Francis, there is a reasonable inference that the corrective actions were placed in their files with the intention of rendering them ineligible.

**Annual Performance Appraisals**

A second criterion for determining one's eligibility for rehire was his/her 2007 performance appraisal. Given the impact of the appraisals on associates' livelihood, the appraisal forms, themselves, should be well-constructed and the appraisers should take great care to do the appraisals thoughtfully, accurately, and fairly (Latham & Wexley, 1994; Gomez-Mejia, Balkin, & Cardy, 2010[3]). The material I reviewed indicates that this was not the case at OfficeMax. Appraising employees based on their contributions to the mission is a reasonable idea, in principle. In practice, however, the result is an appraisal form that uses a lot of jargon, without really clarifying how these objectives translate to day-

---

[3] Again, one would be hard-pressed to find an introductory HR text that would indicate otherwise.

BP000204

to-day performance as a store associate. Coupled with the hard-to-decipher wording of the objectives against which associates are rated, is the fact, that for each of these objectives there is only a three-point scale, which is anchored in similarly ill-defined jargon. For example, it is unclear what "championing integrity and accountability" means and/or how this would differ from "living integrity and accountability." Further, within each of the values, it is quite possible for an employee to excel on some of the bullet points, but not on others. The result is a subjective appraisal form that allows the rater to justify almost any rating s/he chooses to give to any employee. Indeed, there is abundant evidence in the literature on performance appraisals (c.f., Campbell, Campbell, & Chia, 1998; Woehr & Huffcutt, 1994) that failure to clearly define criteria and failure to provide frames of reference for evaluating employees, results in biased judgments.

> *Example. Manager A dislikes Employee X, while Manager B likes Employee X. Employee X has a tendency to act before thinking. Manager A could justify a low rating on sense of urgency, by noting that Employee X fails to place an appropriate emphasis on analysis, whereas Manager B could justify a high rating on sense of urgency, by noting that Employee X springs into action.*

Mr. Prentice's 2007 appraisal exemplifies the subjectivity in the performance appraisal. Exhibit 8 evidences the fact that Mr. Prentice refused to sign his 2007 appraisal, because he did not agree with Ms. Bynum's ratings on some of the items. In particular, he testified (92), "They failed me in leadership, because they said I didn't discipline. But I couldn't discipline without asking management's help, and I have the letters to show I have written to several managers asking for their help in disciplining employees and nothing was done." In her deposition, Ms. Bynum corroborated (30) the fact that she recommended that Supervisors consult with her regarding disciplinary actions, "just to make sure we were -- were within the store policy and within the Virgin Islands code." Indeed, Exhibit 18 reflects a memo from Mr. Prentice to Ms. Bynum dated 11/2/07, referencing multiple previous conversations regarding insubordination

of the same associate.  Having received this appraisal, Mr. Prentice spoke with Ms. Bynum (97):

"When I questioned it with her, she mentioned about the discipline part of the employees, which, as I explained, we wasn't allowed to take an employee and write them up and send them home for a week… She was trying to say, like I must get aggressive with the employees.  How – how aggressive I could get when I can't send them home?"

   The limitations of the appraisal form are further exacerbated by the fact that there are only three possible ratings.[4]  For decades (Cronbach, 1950; Weijters, Cabooter, & Schillewaert, 2010), scholars have demonstrated that minimizing the number of response options lowers the reliability of the measure. This occurs because respondents are forced to choose among a set of options that precludes them from making the finer-grained distinctions they may, in fact, observe.

>   *Example.  Even if we could assume that Store Managers have a shared perspective on what Integrity and Accountability mean and a shared perspective as to the notion of Living Values versus Championing Values, an employee who demonstrates Living Values half of the time and Championing Values the other half of the time would be equally likely to receive "Lives Values" as s/he would be to receive "Champions Values."*

   However, the drawbacks of the performance appraisal extend beyond the subjectivity and psychometric limitations.  The overall score one receives is partly dictated by this information and partly dictated by the extent to which store profitability and sales exceed or fall below plans.  There are so many factors that can affect a store's profitability (and numerous reasons why planned figures may be unrealistic) that are beyond the control of individual employees, that including these metrics as part of individual employees' appraisals is inappropriate.

>   *Example.  Employee A is a top seller, but Employee B idles through the day.  Employee A's evaluation would be diluted by Employee B's loafing, whereas Employee B would reap the benefits of Employee A's hard work.*

---

[4] Although the testimony indicates that "champions" represents a 5; "lives" represents a 3; and "does not live" represents a 1, the number of response options is still three.

Beyond the appraisal form, the testimony reveals that the conduct of Mr. Prentice's review was unnerving.  Approximately one month prior to his 3/12/10 appraisal, Mr. Prentice had written a memo (Ex. 6) to Ms. Bynum dated 2/10/08, in which he indicated, "I am very disappointed, as I realized that a situation where I was told is an opportunity for growth, has changed to what seems to be discriminatory."  Mr. Prentice testified (147) that during his appraisal, the letter was read back to him, in what he perceived to be a sarcastic manner (Complaint, p. 3).  As noted in Latham and Wexley's text, "explain to the employee, *without hostility*, what you have seen and why it concerns you.  The discussion should *not* be an emotional one on your part.  You as a manager are paid to solve problems; your role is not to act as the judge, jury, and executioner.  Your tone should be no different from that of a newscaster" (p. 232; italics from original).

The 2007 performance appraisal of Ms. Francis is even more troubling.  By all accounts, it appears that it was never done.  Ms. Francis revealed (69) that, "I never saw any of them.  I only saw it when I was going through the stacks of papers…That was the first time I saw it."  Mr. Flores reported that he had never seen an appraisal for her, and indicated (59) that what was produced as Bates 758-761, contained information regarding store performance that was auto-populated, that it is company practice that appraisals be signed, and that "there should be comments."  Ms. Bryan and Ms. Ramirez were also unable to explain why no performance appraisal appeared in Ms. Francis' personnel file.  However, Ms. Bynum did recall there being an issue with Ms. Francis' appraisal.  She disclosed (105) "The performance appraisals were done though a computer system and it was very confusing.  We put something in, and then we got something back.  What I got back was wrong… Several were wrong, and I had to go back in

and correct them…. When I went back in for Ms. Francis, and it has something to do with the reason why there are no comments here, but I don't remember quite what, but I remember hers being totally wrong.  And when I went back to correct it, I was unable to do so in the computer system… What I put in was correct, but what I got back was not.  And when I tried to correct it, the computer wouldn't let me, so I called the regional office in Puerto Rico and attempted to get them to help me fix it… It seems like I spoke to Jose Torres, but I don't know… I don't remember why, but I was not allowed to make any corrections…. To the best of my knowledge they were not made."  Researchers  (see Robbins & Judge, 2010[5]) have noted that there are three components of organizational justice:  distributive justice (the perceived fairness of the outcome); procedural justice (the perceived fairness of the process used to determine the outcome, which includes one's ability to present one's point of view to decision-makers, explanations provided for the outcome, as well as consistency, accuracy, unbiasedness, and openness to appeals); and interactional justice (perceptions about being treated with dignity and respect).   The discrepancy with regard to Ms. Francis' performance appraisal violated the first two principles of organizational justice:  That Ms. Bynum testified that the information was incorrect, evidences the lack of distributive justice; that no explanation was provided as to why Ms. Bynum was locked out of the system, when she attempted to make corrections, evidences lack of procedural justice.

**Compensation Inequities**

<u>No action was taken to address Ms. Francis' wage disparity</u>

---

[5] This model of organizational justice is common to every Organizational Behavior text with which I am familiar.

Shortly after the time when Ms. Bynum noted the error in Ms. Francis' appraisal, she notified Mr. Torres via a 4/10/08 message on OfficeMax's internal messaging system, that the review was wrong and that she should be brought in line with other supervisors.  Mr. Torres' reply indicated that she should discuss with Nannette.  However Ms. Bryan's testimony (158) indicated that only Mr. Torres had the authority to approve such a request; Nannette did not have the authority.  Thus, a cycle ensued whereby after Ms. Bynum made the wage disparity known to Mr. Torres, the sole person who could have approved it, Mr. Torres referred the issue down to Ms. Ramirez, who lacked the authority to do anything about it.  Subsequent to the depositions, however, additional discovery (Bates 177) revealed that Mr. Torres did, in fact, respond to Ms. Bynum's request in an e-mail dated 4/15/08, which simply stated, "Your request Annual Merit for SOPHIA FRANCIS has been rejected by Mr JOSE TORRES <sic>."

Although Ms. Francis' pay inequity surfaced in the wake of the performance appraisal error, Ms. Bryan revealed (153), "Her rate remained the same throughout her employment."  However, the record reflects that this rate, $7.50/hour was considerably less than the $8.50/hour that Mr. Prentice was making, even though Ms. Bryan conceded, "they were the same pay range, same positions." Ms. Francis testified (69) that over the course of her employment, she never received any increases:  "It was during evaluation time, everybody – all the associates get 25 cents, 5- <sic> cent raise.  So, I want to know what happened to me.   It was going on two years... She told me, Yes, Sophia, I put in for a big raise for you... Weeks after... I went back to her, and I asked Juliette, what about the raise... She tell me that management say that it's not in the budget... But she tell me, Anyway, Sophia, I'm going to get your raise for you." Ms. Bynum's message provides clear evidence that upper management was aware of a pay inequity, yet not only did OfficeMax fail to address the inequity, Mr. Torres very clearly articulated an affirmative intention of not wanting to address it.

<u>The compensation package for the Black West Indian employees was lower than that of Whites and
Hispanics</u>

Ms. Francis testified (105) that wage discrimination against Black West Indians was clear,
"Because they had like a log – like payday, they will have your name and the amount and the quantity
that you will get… And after a while, they stop that practice.  They blacked out everything, but
everybody used to see how much everybody used to get paid."

Mr. Prentice also testified that he was aware that the wages paid to the White and Hispanic
employees in the newly created positions were higher than what the Black West Indian employees
made.  Although Mr. Prentice indicated (109) that his knowledge is based on a rumor told to him by a
store associate, the evidence I reviewed indicates that the newly hired employees were, in fact, earning
more money than either Mr. Prentice or Ms. Francis made during their employment at OfficeMax.  In
particular, Ex 21 evidences the fact that Mr. Schawl wanted to pay more than $11.00/hour for a Tech
Specialist (one of the positions for which Mr. Prentice and Ms. Francis would have been able to apply),
because "the cost of living on St. Croix is higher than in Puerto Rico, and I feel that to get the right
people into position here, we are going to have to offer higher wages."  Notably, Ms. Bryan testified (72)
that Nannette Ramirez told her that the reason Mr. Prentice was not selected, was because he
requested a higher salary.  However, Ms. Ramirez's sworn testimony revealed that she denied having
any knowledge as to why Mr. Prentice was not selected.

Clearly, then, Ms. Bryan and Ms. Ramirez cannot both be telling the truth.  Although it was
never disclosed how much Mr. Prentice was allegedly requesting, <u>It seems highly unlikely to me</u> that Mr.
Prentice, who prior to the layoff, was making $8.50/hour, would have priced himself out of the labor
market, by requiring  an increase in excess of 30% (the cap that Mr. Schawl was attempting to lift in his
e-mail).  Further, discovery documents produced after the depositions (1843) reveal that the maximum

salary for the Operations Supervisor position ranged from $14.25 to $19.00.[6] Obviously, this would have

allowed for a great deal of room to negotiate. However, after testifying that Mr. Prentice was denied

the Operations Supervisor position because his salary request was too high, Ms. Bryan concedes that

there is no document evidencing that Mr. Prentice requested an out-of-range salary and that, "there

was no offer ever made to him." Given the discrepancy between Ms. Bryan's and Ms. Ramirez's

testimony and the implausibility that Mr. Prentice could have requested a salary that would have priced

himself out of contention, Ms. Bynum's testimony is untenable.

In addition to the disparity in base pay, the testimony (Flores, 71; Bynum, 121; Prentice, 107)

reflects that fact that the White and Hispanic employees who were brought into the St. Croix store after

the restructuring were flown to St. Croix, put up in hotels and received taxi service to and from the

store. These amenities are part of their total compensation package, benefits which the plaintiffs never

received. As Mr. Prentice notes, "to contract a taxi every day and move you and stay in a hotel, that's

part of – of your pay." Moreover, it represented an unnecessary expense to OfficeMax. As Flores admits

with regard to filling the store with people coming from Puerto Rico (77), "Yeah, that was very

expensive." In short, the decision to staff the store with off-island employees resulted in higher labor

costs; therefore, it had no business sense. Notably, in reading Attorney Rohn's letter to Attorney

Morgan, dated 11/10/10, I was made aware that Virgin Islands Code only allows reductions in force due

to economic hardship. Given that OfficeMax went to such expense to prevent the plaintiffs from

remaining employed, it would be difficult to justify an economic hardship, particularly given Mr.

Richardson's testimony that the St. Croix store was a top performer.

**Job Descriptions**

---

[6] This document specifies different ranges for six different structures, but doesn't indicate which of these structures was applicable for the St. Croix store. However, even in the lowest-paying structure, the maximum would have been nearly 60% more than what Mr. Prentice had been making before the reorganization.

Pre-restructuring

Although OfficeMax maintained position descriptions for both the pre-restructuring and post-restructuring job titles, these descriptions were virtually meaningless. When Ms. Francis was questioned (60) about her actual responsibilities vis-à-vis the responsibilities indicated in the Logistics Supervisor position description (Ex. 5), she revealed that three of the fourteen (21%) of the responsibilities indicated in her job description were functions that she didn't perform. Likewise, Mr. Prentice was asked to indicate which of the duties in the position description for Operations Supervisor (Ex. 3) he performed. He disclosed that seven of the seventeen (41%) responsibilities listed were not part of his job. Moreover, despite the fact that the position descriptions for the Operations Supervisor (Ex 3) and Sales Supervisor (Ex 4) positions appear quite different on paper, in practice, the jobs were quite similar. Mr. Prentice's testimony (54) indicates, "the responsibility of both jobs was, to me, was almost the same thing... only that the cash office and so forth wasn't really a process part of it, of the sale... my assignment from mgt on both – on both jobs were almost the same thing.... What I'm saying, even when I was sales, they still had me doing operation work... And even when I was operation, they had me doing sales work.... A lot of this stuff was assigned to us by Juliette or the other manager. So it wasn't – it wasn't like we were following these documents to do our job."

Post-restructuring

Ms. Francis testified (49) that the position she held as logistics supervisor continues to be in place. "Because the store wouldn't be running if you don't do integrity and counts...The position exists underneath a different title... The merchandising manager... Because the duties are the same.... I saw when they had the job open – posted on the Internet, I saw the duties. Then I compared the duties with the logistics supervisor for the merchandising manager. ... The

BP000212

only thing you would be carrying a key and opening and closing the store, which that could be taught, because I'm willing to learn." In discussing the differences between the Logistics Supervisor she held and the Merchandise Assistant Manager position she sought, Ms. Francis testified (65) that other than item 13 In Ex 6, she didn't see any differences between the two positions. Mr. Prentice had a similar observation (83): "From the meeting, we were told these positions are gone... But then the position went from Operations Supervisor to Store Operations Supervisor. But when you read the responsibilities on the line, it was the same as the operations... If you look at the responsibility of the store operation, and the responsibility of the Operation Supervisor, they're basically the same thing; just one or two little thing different." He later continued (103), "I saw just Hispanics and Whites... I watched them do what they were doing... I concluded they were doing the same thing that I did, and so why didn't I get the job back?" Ms. Bynum also testified (81) that the new jobs were essentially the same as the ones that were eliminated: "They were eliminating them as they existed...They renamed them. Everything had a different name. I don't remember if they were called assistants, but there were – it was just different names." She further explained the reorganization process as (83), "Everything had a new name, and one had to resign or one was laid off and just had to apply for one of these other positions... I followed the document saying that OfficeMax had restructured, that people in your position will be laid off, and you will have the opportunity to reapply... for one of the following positions." If the goal of the restructuring was to cut costs, then renaming the jobs does not serve that purpose. Indeed, given that the pay ranges for the new job titles were considerably higher than what Mr. Prentice or Ms.

BP000213

Francis were making under the old titles, having people reapply to the same job with a higher

pay scale cannot result in lower costs.

**Re-employment Eligibility Assessments**

To determine which of the laid-off employees would be eligible for rehire into one of

the new positions, OfficeMax initially indicated that employees who were on final written

notice and/or who received a 2007 performance appraisal of "Does Not Live Values" would not

be considered.  Mr. Richardson testified (83) that after disseminating this information, "we did

make the decision immediately within the process...there should be an opportunity to evaluate

that associate's current performance... And that was called an assessment... For two reasons...

One, to evaluate if an associate had made improvement, that we could acknowledge that

improvement.  And we also realized that where some associates that had started with the co

after or outside of the time period, that we give an annual appraisal."

As I indicated in prior sections, Ms. Francis had never had a performance appraisal,

while Mr. Prentice had an appraisal in 2007, but was deemed to "Not Live Values."  In theory,

then, the change had the potential to benefit Mr. Prentice.  In practice, however, this was not

the case, because the HRIS system indicated that he was on final written warning (Bates 765);

thus, he would have appeared as ineligible, even though the re-employment eligibility

assessment indicated that he met expectations.  In the case of Ms. Francis, because of the final

written notice resulting from her pre-authorized absence, she would still have been deemed

ineligible.

BP000214

It is unclear from the testimony whether any assessments were done on Mr. Prentice or Ms. Francis. When Mr. Flores was asked (63) whether there were assessment forms given to the store managers for the assessments, he gave a non-responsive reply: "From the document, I can tell that it was entered into the system... It was probably a web page kind of, that the store manager will key in." Likewise, Ms. Ramirez's testimony (81) merely indicates, "It's supposed to have been the store manager." When Ms. Ramirez was questioned about how the information was provided (83), she indicated that the information was provided by the store manager. When further probed as to whether she was sure that that information was conveyed, she tautologically replies, "of course I am, because the information on the spreadsheet is information that I obtained from the store managers." Further, Ex 17, a string of e-mails starting 6/14/08 from Tim Ahrendsen to Chris Richardson and Mary Bryan, evidences the fact that the company planned to move forward, despite the fact that there were still about 60 missing assessments. "I can pull the data again tomorrow if you need so that we can continue to manage the exceptions... hopefully a few more follow-ups we can have all of this data on Monday a.m. or else we are going to have to decide what to do without the data."

**Staffing the Newly-Created Positions**

The document stamped as Bates 420 indicates that everyone who applied internally would be interviewed. Bates 387 indicates that Store Managers will be able to look outside the company, "once the selection process has been completed for the reorganization and we have identified where true openings exists and have determined there are no internal applicants who can fill the position, we will proceed with posting externally." However, OfficeMax did not

follow these policies.  Both Ms. Francis and Mr. Prentice were qualified for the positions to which they applied.  Nonetheless, despite the fact that Mr. Prentice was qualified for the Specialist, Store Furniture and Supervisor, Store Operations positions, he was not chosen for either.  He was interviewed for the former position, but this did not occur until months after the position had already been posted.  Moreover, although Exhibit 21, an 8/6/08 e-mail exchange between Mr. Schawl and Ms. Ramirez, indicated that they had a favorable opinion of Mr. Prentice after the interview, the idea of rehiring him lost traction.  A week-and-a-half after this exchange occurred, Store 1368 finally indicated in a message to Ms. Ramirez, that Steven would fax over Mr. Prentice's appraisal.  Although I did not find any information as to whether or not the appraisal had, in fact, been faxed, clearly some negative information about Mr. Prentice had been conveyed on or after 8/6/08, that resulted in the Supervisor, Store Operations positions being granted to the White candidates, Mr. Wilcoxin and Ms. Olsen, rather than to Mr. Prentice.

Ms. Francis applied and was qualified for the positions of Assistant Merchandise Manager, Assistant Store Manager, and Store Associate.  However, she was not even interviewed for these opportunities.

The net effect of the layoff was that Ms. Bynum was left as a management team of one, in one of the highest volume stores in the company.  Clearly, she needed help.  But, although Ms. Bynum had conversations with people from Puerto Rico about filling those positions locally, she was told (22) "Basically, can't find qualified candidates."  Likewise, Mr. Flores testified (35), "I did not participate with her because nobody applied for the positions, for the management positions....

BP000216

Assistant Store Manager and Merchandise Assistant Manager." Of the positions that were newly created, all were staffed with Whites or Hispanics. Mr. Flores testified (69) that he helped Juliette address the store understaffing issue "from my resources, which were managers and supervisors from the Puerto Rico stores… We brought them in to help… None of those people applied for any of the positions in the store. They were just there to help and keep the store running." Flores later notes (75) "After some time…the people in Puerto Rico were kind of tired of the rotation, and they were not willing to stay more than a week or two…And I reached out to the acting TSVP…And he said, well… because we have a team of people that we can use from the Florida stores… And he offered to help…. And that's how we came with Jay Casto. I can't remember the name of the other two or three people…But we brought in a team that were willing to stay for three months or four months."

Mr. Flores' claim that the staffing of the St. Croix store with people from Puerto Rico and Florida (Whites and Hispanics) was merely a temporary measure, is moot. Given the high turnover rate, the distinction between temporary and permanent is a matter of semantics. These so-called "temporary" employees stay as long as the permanent employees do. For example, Steve, who was a Caucasian stateside hire, stayed in the Store Manager position only five days, despite being a "permanent" hire. Likewise, John Tost, a Caucasian who was hired as a "permanent" Store Manager stayed for less than a year. Thus, regardless of whether one chooses to call an employee "temporary" or "permanent," the fact remains that nearly all of the positions at or above what was previously the Supervisor level, have been staffed by Whites or Hispanics. Given that the layoffs left the store so understaffed that OfficeMax saw fit to hire replacements at a considerably higher expense, the inference is that the layoff was not intended as a cost-cutting measure, but rather as a means of eliminating the existing staff.

**Summary**

Having examined the materials presented in this case, it is my opinion that:  1. Mr. Prentice and Ms. Francis, as hourly employees, should not have been held accountable through corrective actions or performance appraisals, for store-wide issues that were beyond their control; 2.) Corrective actions did not follow a progressive discipline sequence; 3. OfficeMax lacked a system of checks and balances to ensure that documents that have the potential to affect employees' livelihoods in fact, belong in their personnel files; 4. OfficeMax was aware of, but failed to act on known errors with regard to appraisal information and pay inequities; and 5.) OfficeMax created job descriptions that had little relevance to the work being performed.  Further, given that maintaining the St. Croix store with "temporary" employees from Puerto Rico and Florida[7] came at great expense to OfficeMax, there was no legitimate business purpose being served by laying-off Mr. Prentice and Ms. Francis, and refusing to rehire them.

*Caren Goldberg, Ph.D.*

Signed on 12/15/10

---

[7] Notably, from the discovery documents that were provided after the depositions, I did not find evidence that *any* of the newly hired individuals were Black and/or West Indian.

BP000218